

FILED
IN OPEN COURT

OCT 19 2017

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) <br> ) <br> v. ) <br> ) <br> RAYMOND JUIWEN HO, ) <br> ) <br> *Defendant.* ) <br> ) | No. 1:17-CR-215 |

## STATEMENT OF FACTS

The United States and Defendant RAYMOND JUIWEN HO agree that the following facts are true and correct, and that had this matter proceeded to trial, the United States would have proven them beyond a reasonable doubt with admissible and credible evidence.

1. The Defendant is a naturalized American citizen originally from Taiwan. At all times relevant to this Statement of Facts, the Defendant resided in Vienna, Virginia, which is within the Eastern District of Virginia.

2. The Defendant was a practicing attorney for an intellectual property law firm based in Washington, DC and had been barred in Georgia since on or around December 30, 1994, and Washington, D.C. since on or around May 3, 1996. The Defendant also has been admitted to practice before the U.S. Patent and Trademark Office since on or around April 28, 1998.

3. At all relevant times, the Defendant owned and controlled the following bank accounts:

   a. *BB&T 1200 Account*: an Interest on Lawyers' Trust Account ("IOLTA") at BB&T ending in 1200 under the business name of HG International

PLLC, which the Defendant opened under his sole signatory on or about February 6, 2014.

b. *BOA 1223 Account*: an IOLTA at Bank of America ("BOA") ending in 1223 under the business name of HG International PLLC Trustee, which the Defendant opened under his sole signatory on or about January 29, 2014.

c. *Charles Schwab 9528 Account:* an account at Charles Schwab ending in 9528 under the Defendant's name, which the Defendant opened under his sole signatory on or about October 3, 1996.

d. *HSBC-USA 5650 Account*: an account at HSBC-USA ending in 5650 and under the name of the Defendant, which the Defendant opened under his sole signatory on or about June 6, 2014.

e. *HSBC-HK 4888 Account*: a foreign account at HSBC–Hong Kong ending in 4888 under the business name of Ho Group Holdings, Inc., which the Defendant opened on an unknown date.

f. *JPMorgan 6217 Account*: an account at JPMorgan Chase ending in 6217 and under the business name of FIN International LLC, which the Defendant opened under his signatory and the signatory of a third-party individual on or about February 28, 2013. On or about August 1, 2014, the Defendant removed the third-party individual from the account and became the sole signatory.

g. *Mega Bank 0738 Account*: an account at Mega International Commercial Bank ending in 0738 under the business name of Ho Group Holdings, Inc.

h.  *PNC 4749 Account*: an IOLTA at PNC Bank ending in 4749 under the business name of HG International PLLC, which the Defendant opened under his sole signatory on or about March 24, 2014.

i.  *SunTrust 9738 Account*: an account at SunTrust ending in 9738 under the business name of NDQ International, PLLC, which the Defendant opened under his sole signatory as a member of NDQ International, PLLC on or about June 17, 2014.

j.  *TD Bank 0894 Account*: an account at TD Bank ending in 0894 under the business name of HG International PLLC, which the Defendant opened under his sole signatory on or about July 28, 2014.

k.  *TD Bank 0901 Account*: an account at TD Bank ending in 0901 and under the name of the Defendant, which the Defendant opened under his sole signatory on or about July 28, 2014.

l.  *United Bank 9962 Account*: an account at United Bank ending in 9962 and under the name of JARC International, LLC, which the Defendant opened under his sole signatory on or about July 14, 2015.

m.  *United Bank 5586 Account*: an IOLTA at United Bank ending in 5586 and under the name of HG International PLLC, which the Defendant opened under his sole signatory on or about July 21, 2015.

I.  **The Conspiracy to Commit Money Laundering**

4.  Beginning as early as in or around March 2013 and continuing through at least on or about February 17, 2017, in the Eastern District of Virginia and elsewhere, the Defendant conspired, confederated, and agreed with other persons to: (a) conduct or attempt to conduct a financial transaction, which involved the proceeds of a specified unlawful activity, knowing that

3

the property involved in the financial transaction represented the proceeds of some form of unlawful activity, and knowing that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity, to wit, wire fraud in violation of 18 U.S.C. § 1343; (b) transport, transmit, or transfer, or attempt to do so, a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States, knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity, to wit, wire fraud in violation of 18 U.S.C. § 1343; and (c) knowingly engage and attempt to engage in a monetary transaction in criminally derived property valued greater than $10,000 and derived from specified unlawful activity, to wit, wire fraud in violation of 18 U.S.C. § 1343, all in violation of 18 U.S.C. § 1956(h) (hereinafter, "the Conspiracy"). At all relevant times, the underlying wire fraud scheme was conducted by the Defendant's co-conspirators with the intent to defraud.

5. The goal of the Conspiracy was to fraudulently obtain money from individuals and corporate entities, including investment firms, by sending emails to individuals or entities associated with the targeted individuals and entities in which the emails impersonated certain individuals and directed the recipients of the emails to wire money to particular bank accounts that the Defendant and his co-conspirators owned or controlled.

6. To accomplish the Conspiracy, members of the Conspiracy either gained access to an email account belonging to an individual who was a customer of an investment firm or other

4

financial entity or otherwise was known to the corporate entity (without the email account holder's knowledge or consent), or created a fake email account that imitated, or "spoofed," an email account that belonged to an individual who was a customer of an investment firm or other financial entity or otherwise was known to the corporate entity. Members of the Conspiracy then sent emails to other individuals or particular investment firms, financial entities, or other corporate entities and convinced the recipients of the emails to transfer the victims' funds to bank accounts owned or controlled by the Defendant or his co-conspirators. Once the funds were transferred as directed, the Defendant and his co-conspirators would transfer the victim customers' money again, including into other bank accounts located within and outside the United States and via withdrawals.

7. The Conspiracy involved the Defendant and at least five co-conspirators, some of whom the Defendant recruited to join the Conspiracy and aid in the movement of victim customers' money. The Defendant received a commission from certain co-conspirators each time he (or one of the individuals he had recruited) transferred the victim customers' money as directed by their co-conspirators.

8. The Defendant accepted direction predominantly from a particular co-conspirator, understanding at all relevant times that this individual was involved in an unlawful scheme to fraudulently obtain money, and the Defendant knowingly and voluntarily agreed to assist this individual in executing the Conspiracy.

9. During and in furtherance of the Conspiracy, the Defendant and his co-conspirators committed the following acts, each of which was, if not directly performed by the Defendant, reasonably foreseeable to him based on facts of which he had actual knowledge but that he choose to ignore:

5

### A. Money Laundering Activities in Mid-July 2014 (Value of Funds Intended for Laundering: $402,753.50; Value of Funds Actually Laundered: $360,300)

10. In or around July 2014, a co-conspirator accessed without authorization the personal email account of an individual who resided in California and is identified here by the initials M.L. The co-conspirator, impersonating M.L., corresponded via email with M.L.'s Certified Public Accountant ("CPA") regarding a purported real estate transaction. The co-conspirator directed the CPA to remit $287,490.53 to the Defendant's BOA 1223 Account, and sent the CPA a fraudulent invoice on HG International PLLC's letterhead as supporting documentation.

11. On or about July 14, 2014, the CPA, on behalf of M.L., transferred $287,490.53 from M.L.'s bank account to the Defendant's BOA 1223 Account.

12. Between on or about July 15 and 17, 2014, co-conspirators caused at least $115,262.97 of misappropriated funds obtained from other victims also to be deposited into the Defendant's BOA 1223 Account.

13. On or about July 17, 2014, the Defendant transferred $352,900 out of his BOA 1223 Account to co-conspirators and himself, including by withdrawing $106,900 in the form of a $50,000 cashier's check (no. 1002503455) and a $56,900 cashier's check (no. 1002503454); transferring $140,000 to an account at Community Bank of Louisiana under the name of a third-party individual doing business as United Concordia; and transferring a total of $106,000 to an account at Guarantee Trust Bank under the name of a co-conspirator in Nigeria. The Defendant deposited the $50,000 cashier's check (no. 1002503455) into his SunTrust 9209 Account, and also made a $7,400 cash withdrawal from his BOA 1223 Account.

14. M.L.'s bank later recovered $29,410.53 of M.L.'s misappropriated funds, leaving M.L. with an outstanding loss of $258,080.

### B. Money Laundering Activities in July and August 2014 (Value of Funds Intended for Laundering: $760,000; Value of Funds Actually Laundered: $468,900)

15. In or around July and August 2014, a co-conspirator accessed without authorization the email account of an individual who resided in Maryland and is identified here by the initials M.G. The co-conspirator, impersonating M.G., corresponded via email with M.G.'s personal assistant and directed M.G.'s personal assistant to make certain transfers of funds held by M.G.'s investment firm.

16. On or about July 18, 2014, the Defendant sent an email to a co-conspirator that listed, among other things, the account numbers and routing information for the following bank accounts: the SunTrust 9738 and 9209 Accounts; the HSBC–USA 5650 Account; the HSBC–HK 4888 Account; the PNC 4749 Account; the BB&T 1200 Account; and the JPMorgan 6217 Account. The Defendant noted in his email that the co-conspirator already had his "other affiliated bank accounts that are still current at Wells Fargo, RBC, and etc.," and that he "plan[ned] to open more accounts due to account closures at Bank of America, Citibank, and Wells Fargo."

17. From on or about July 30, 2014, through on or about August 18, 2014, M.G.'s investment firm, B.A., followed the instructions it received from M.G.'s personal assistant and conducted seven wire transactions out of M.G.'s bank account that totaled $1,180,000, of which $640,000 was transferred to the Defendant's TD 0894 Account and $60,000 was transferred to the Defendant's JPMorgan 6217 Account. In addition, on or about August 6, 2014, $60,000 from a financial account located in the Bahamas was transferred into the Defendant's JPMorgan 6217 Account.

18. From on or about August 1, 2014, through on or about August 14, 2014, the Defendant transferred to co-conspirators $107,400 out of his JPMorgan 6217 Account and

7

$283,000 out of his TD 0894 Account. Also during this period of time, the Defendant made cash and check withdrawals from his JPMorgan 6217 Account and his TD 0894 Account that totaled $78,500, of which the Defendant deposited $30,000 into his TD 0901 Account and $35,000 into his HSBC–USA 5650 Account.

19. M.G.'s bank was able to recover $452,481.31 of M.G.'s misappropriated funds, leaving M.G. with an outstanding loss of $727,518.69.

20. As a result of the fraud perpetrated on M.G., B.A. incurred $247,906.30 in costs relating to B.A.'s investigation and response to the fraudulent activity.

21. On or about December 13, 2014, the Defendant contacted a co-conspirator via email and stated that he was meeting with law enforcement on or about December 16, 2014, regarding six wire transfers sent to or from the Defendant's TD 0894 Account between on or about August 6, 2014, and August 20, 2014, including wire transfers involving M.G.'s misappropriated funds. The Defendant asked the co-conspirator to provide information regarding the wire transfers and requested the co-conspirator's assistance in generating a contractual agreement in order to make the transactions appear to be legitimate, writing: "Also, I will need to create general paymaster agreement by tomorrow to cover the above[-listed] transactions."

22. The Defendant attached to the December 13, 2014 email a number of wire transfer confirmation receipts that reflected wire transfers in interstate and foreign commerce, including the following:

> a. On or about August 7, 2014, a wire transfer of $160,000 from M.G.'s bank account located in Maryland to the Defendant's TD 0894 Account in the Eastern District of Virginia.

b.  On or about August 8, 2014, a wire transfer of $128,000 from the Defendant's TD 0894 Account in the Eastern District of Virginia to a co-conspirator's account ending in 2100 in China at the Bank of Communications Co. Ltd.

c.  On or about August 12, 2014, a wire transfer of $190,000 from M.G.'s bank account located in Maryland to the Defendant's TD 0894 Account in the Eastern District of Virginia.

d.  On or about August 14, 2014, a wire transfer of $155,000 from the Defendant's TD 0894 Account in the Eastern District of Virginia to a co-conspirator's account ending in 2100 in China at the Bank of Communications Co. Ltd.

e.  On or about August 18, 2014, a wire transfer of $290,000 from M.G.'s bank account located in Maryland to the Defendant's TD 0894 Account in the Eastern District of Virginia.

23. On or about December 16, 2014, law enforcement officers interviewed the Defendant regarding his involvement in the defrauding of M.G. During the interview, the Defendant misrepresented that he was a victim of the fraud and that he had no email exchanges with a particular co-conspirator. The Defendant also presented to law enforcement a contractual agreement dated on or about August 1, 2014, which purported to memorialize an agreed-upon transfer of funds by the Defendant on behalf of an entity located in Singapore. The Defendant further advised that he did not have an ongoing business relationship with the co-conspirator.

### C. Money Laundering Activities in September 2014 (Value of Funds Intended for Laundering: $1,330,905.47; Value of Funds Actually Laundered: $937,139)

24. In or around September 2014, a co-conspirator accessed without authorization the personal email account of an individual residing in California and identified here by the initials R.D. The co-conspirator, impersonating R.D., corresponded via email with R.D.'s bank, JPMorgan Chase, and directed the bank to make a wire fund transfer. Also in or about September 2014, a co-conspirator accessed without authorization the email account of an attorney who resided in California and is identified here by the initials S.I. The attorney, S.I., represented an individual who resided in California and is identified here by the initials R.B., who was involved in a business transaction with a company identified here by the initials Q.S. The co-conspirator, impersonating S.I., corresponded via email with Q.S. and directed Q.S. to make certain wire fund transfers.

25. On or about September 23, 2014, JPMorgan Chase followed the instructions it received from the co-conspirator impersonating R.D. and transferred $27,840.50 from R.D.'s JPMorgan Chase account ending in 1229 to another JPMorgan Chase account ending in 8970, which a co-conspirator had opened under her sole signatory on or about November 19, 2012.

26. On or about September 25, 2014, Q.S. followed the instructions it received from the co-conspirator impersonating S.I. and transferred $302,928.12 to the JPMorgan Chase account ending in 8970, which a co-conspirator had opened under her sole signatory on or about November 19, 2012. Q.S., based on the co-conspirator's misrepresentations, also directed an escrow company to release funds that belonged to R.B. On or about September 26, 2014, the escrow company followed the instructions it received from Q.S., which were based on instructions that Q.S. received from the co-conspirator, and transferred $1,000,136.85 to the JPMorgan Chase account ending in 8970.

27. The Defendant subsequently directed the co-conspirator who controlled the JPMorgan Chase account ending in 8970 to disburse in a particular manner the funds that had been deposited into that account (*i.e.*, $27,840.50 from R.D. and $1,303,064.97 from Q.S. and an escrow company). The co-conspirator who controlled the JPMorgan Chase account ending in 8970 then transferred $742,371 to various co-conspirators, as well as $26,448 to another JPMorgan Chase account ending in 5945, which was held under the name of another co-conspirator. On or about September 25, 2014, the co-conspirator who controlled the JPMorgan Chase account ending in 5945 withdrew $26,000 in the form of a check and deposited these funds into the Defendant's HSBC–USA 5650 Account. The Defendant withdrew $1,000 from his HSBC–USA 5650 Account on or about September 26, 2014, and transferred approximately $22,200 to co-conspirators through international wires. One co-conspirator also issued an official check of $70,000 to the Defendant's Charles Schwab 9528 Account, $20,880 of which the Defendant kept and the rest of which, $49,120, the Defendant distributed to another co-conspirator.

28. JPMorgan Chase reimbursed R.D. and ultimately recovered all of R.D.'s stolen funds, leaving no outstanding loss as to JPMorgan Chase or R.D.

29. R.B., on the other hand, recovered $79,088.83 of the $302,928.12 in stolen funds (for a loss of $223,839.29), and the escrow company recovered only $532,981.80 of R.B.'s $1,000,136.85 in stolen funds (for a loss to R.B. of $467,155.05). In addition, R.B. filed a civil lawsuit against Q.S. in connection with the fraudulent activity. Q.S. ultimately paid $80,000 to settle, leaving a total outstanding loss to R.B. of $610,994.34.

30. Law enforcement officers interviewed the Defendant on or about January 5, 2015, regarding his involvement in defrauding R.B. During the interview, the Defendant

misrepresented that he was a victim of the fraud and that he had not communicated with a co-conspirator by email. The Defendant also promised that he would stop doing "blind transactions." However, the Defendant continued to communicate by email with the aforementioned co-conspirator, and the Defendant continued to engage in transactions that involved his co-conspirators.

        **D.**      **Money Laundering Activities in October 2014 (Value of Funds Intended for Laundering: $185,000; Value of Funds Actually Laundered: $377,000)**

31. In or about October 2014, a co-conspirator accessed without authorization the email account of an individual who resided in Georgia and is identified here by the initials J.D. The co-conspirator, impersonating J.D., corresponded via email with J.D.'s investment firm, F.F., and directed the firm to make certain wire fund transfers.

32. On or about October 22, 2014, F.F. followed the instructions it received from the co-conspirator impersonating J.D. and transferred $185,000 belonging to J.D. to an account held at Bank of America under the name VRBIA Patent Group PLLC, which a co-conspirator (whom the Defendant had recruited) had opened under his sole signatory.

33. The Defendant directed the co-conspirator to disburse the stolen funds in a particular manner, which included a transfer of $175,000 to another Bank of America account held by VRBIA Patent Group PLLC; a wire transfer of $148,000 to a bank account in Thailand; and a transfer by check of $27,500 to another co-conspirator's account, $26,500 of which was then transferred by way of certified check to the Defendant's Charles Schwab 9528 Account.

34. The investment firm, F.F., reimbursed J.D. but did not recover any of the stolen funds, leaving an outstanding loss of $185,000.

### E. Money Laundering Activities in November 2014 (Value of Funds Intended for Laundering: $240,000)

35. In or about November 2014, a co-conspirator accessed without authorization the email account of an individual who resided in California and is identified here by the initials F.O. The co-conspirator, impersonating F.O., corresponded via email with F.O.'s financial advisor and directed the advisor to make certain wire fund transfers, purportedly in furtherance of a real estate transaction.

36. On or about November 26, 2014, F.O.'s financial advisor followed the instructions received from the co-conspirator and transferred $240,000 to an account held at TD Bank under the name of FIN International LLC, which a co-conspirator had opened under his sole signatory on or about November 24, 2014.

37. The Defendant directed the co-conspirator to disburse the stolen funds in a particular manner, attempting to transfer $237,735. Yet, the fraud was identified before the disbursements could be made.

38. F.O. recovered $234,735 of the stolen funds, leaving an outstanding loss of $5,265.

### F. Total Actual and Intended Amounts of Laundered Funds

39. For the money laundering activities discussed above, the total amount of money intended to be laundered by the Defendant and his co-conspirators, in a manner that was reasonably foreseeable to the Defendant, was $2,918,658.97, while the total amount of money actually laundered by the Defendant and his co-conspirators was $2,143,339.

## II. The Money Laundering Activities Involved in the Undercover Operation

40. On or about November 16, 2015, an undercover law enforcement agent used the email account of an individual known to the Defendant to correspond with the Defendant about

moving money "out of the country urgent[ly]" and in a "confidential" manner. The individual whose email account was used to correspond with the Defendant had earlier informed law enforcement that the Defendant was involved in illicit money transfers, and law enforcement had received corroboration of this information.

41. On or about December 17, 2015, an undercover law enforcement agent met in person with the Defendant at a location within the Eastern District of Virginia. The undercover law enforcement agent provided $12,000 in cash to the Defendant, consistent with the agent's prior conversations with the Defendant. The undercover law enforcement agent informed the Defendant that the funds derived from smuggling illegal aliens into the United States by stating the following with respect to the undercover law enforcement agent's purported "boss": "[Y]eah cause I mean he's in a lot of different things[,] but[,] you know[,] but recently some of the stuff has been from[,] you know[,] moving people across the border and what not." The undercover law enforcement agent also paid the Defendant $600, the equivalent of the five-percent commission that the Defendant had requested previously. The Defendant indicated that he was okay with the illicit business, stating, for instance, that "[t]he less I know the better."

42. Also on or about December 17, 2015, the undercover law enforcement agent and the Defendant had the following exchange:

> Undercover Agent: Alright just like we talked about last week you know you had had mentioned some reports that had to be filed, I want to make sure that those aren't going to be filed.
>
> The Defendant: No, no, no, no it's fine.
>
> Undercover Agent: Oh no? Okay I just want [to] make sure cause[,] yeah[,] if it comes back to myself or my boss[,] yeah.

14

        The Defendant:    No, no it's fine.

The Defendant also indicated that he had engaged in similar transactions before.

43.    Also on or about December 17, 2015, the Defendant deposited the $12,000 he had received from the undercover law enforcement agent into the United Bank 9962 Account at a United Bank branch within the Eastern District of Virginia and transferred the funds to an account designated by the undercover law enforcement agent, which was located overseas. The Defendant also generated a false invoice for the transaction, which he sent to the undercover law enforcement agent via email. The Defendant generated this false invoice in order to create a purportedly legitimate paper trail for the transaction, as the Defendant had volunteered he would.

44.    On or about January 27, 2016, the Defendant participated in a telephone call with an undercover law enforcement agent. The agent informed the Defendant during the call that the agent needed assistance in transferring money from an arms deal in Kenya. The Defendant indicated that he could arrange for the transfer, stating that he would keep the transfer "below the radar" in order to avoid "any issues."

45.    On or about February 12, 2016, the Defendant met with two undercover law enforcement agents at a restaurant located within the Eastern District of Virginia. During this meeting, the agents informed the Defendant that they had received $50,000 in connection with an arms deal in Kenya. The Defendant advised the undercover law enforcement agents that he could launder the money from the arms deal either through a "cover" investment or through a currency exchange, indicating that he had engaged in such money transfers for other individuals.

46.    On or about February 19, 2016, the Defendant met with an undercover law enforcement agent at a location within the Eastern District of Virginia. The agent provided the Defendant with a red, grocery bag containing $50,000 in cash and an additional $2,500 as a

commission payment. The Defendant understood that the money the undercover law enforcement agent had provided him was proceeds of an arms deal in Kenya.

47. Also on or about February 19, 2016, the Defendant deposited the cash he had received from the undercover law enforcement agent in his United Bank 5586 Account at a United Bank branch within the Eastern District of Virginia. The Defendant transferred the funds to an account designated by the undercover law enforcement agent, which was located overseas, and again generated a false invoice for the transaction, which he sent to the undercover law enforcement agent via email. The invoice that the Defendant created described the transaction as a "Currency Exchange / Investment Fund."

48. On or about March 9, 2016, an undercover law enforcement agent met with the Defendant at a location in Florida and provided the Defendant with $65,000 in cash, plus a commission of $3,250. The agent also told the Defendant that the funds were proceeds of an "arms deal" of "AK-47s" destined for "the Congo." The agent further told the Defendant that the firearms were subject to an embargo, that the agent did not have a license to sell or export firearms, that the firearms would be commingled with household goods during shipment from the United States, that the shipping label would be falsified, and also expressly stated that the firearms were "illegal." The Defendant indicated that he would conduct legal research to better understand the various liabilities stemming from this criminal conduct.

49. On or about March 10, 2016, the Defendant deposited the cash he had received from the law enforcement agent into the United Bank 9962 Account at a United Bank branch within the Eastern District of Virginia, and transferred the funds to an account designated by the undercover law enforcement agent, which was located overseas. The Defendant again created a

fake invoice as cover for the transaction, and emailed the invoice to one of the undercover law enforcement agents.

50. On or about June 13, 2016, an undercover law enforcement agent provided the Defendant with $25,000 in cash and a commission of $1,250. The undercover law enforcement agent had previously informed the Defendant that the funds were proceeds of alien smuggling, by stating during a call on or about June 2, 2016, that the undercover law enforcement agent was expecting to receive money from a third party for whom the agent was bringing a "refugee" into the United States. This reference was based on a prior conversation wherein the Defendant had suggested that the undercover law enforcement agent refer to the agent's alien smuggling business as "refugees" because that term is "not as negative" as "human trafficking."

51. On or about June 14, 2016, the Defendant deposited the cash he received from the undercover law enforcement agent into the United Bank 9962 Account at a United Bank branch within the Eastern District of Virginia, and transferred the funds into the Mega Bank 0738 Account. Then, on or about June 21, 2016, the Defendant wired $24,985 from the Mega Bank 0738 Account to a domestic bank account that had been designated by the undercover law enforcement agent. This second transfer was because the undercover law enforcement agent had told the Defendant that his bank expected to see international transfers into his account, and the Defendant was attempting to assist the undercover law enforcement agent by satisfying that expectation.

52. Neither the Defendant nor any of the corporate entities under his control were licensed to engage in the business of providing money transmission services with either the Commonwealth of Virginia or the U.S. Department of the Treasury Financial Crimes Enforcement Network.

53. In total, the Defendant made $176,985 in transfers with funds that undercover law enforcement agents had represented, and which the Defendant believed, to be the proceeds of specified unlawful activity—namely alien smuggling in violation of 8 U.S.C. § 1324 and firearms trafficking, including smuggling goods from the United States in violation of 18 U.S.C. § 554. The Defendant received $7,600 in commissions for these transactions.

54. The statement of facts includes those facts necessary to support the Defendant's guilty plea. It does not include each and every fact known to the Defendant or to the government and it is not intended to be a full enumeration of all of the facts surrounding the Defendant's case.

55. The actions of the Defendant, as recounted above, were in all respects knowing, voluntary, and intentional, and were not committed by mistake, accident or other innocent reason.

56. The Defendant waives any rights under Fed. R. Crim. P. 11(f), Fed. R. Evid. 410, the U.S. Constitution, and any federal statute or rule in objecting to the admissibility of the Statement of Facts in any proceeding.

Dana J. Boente
United States Attorney

Date: September 19, 2017       By: *Alexander P. Berrang*
Alexander P. Berrang
Assistant U.S. Attorney
U.S. Attorney's Office, Eastern District of Virginia

Ryan K. Dickey
Senior Counsel
Computer Crime and Intellectual Property Section
Criminal Division, U.S. Department of Justice

Elizabeth Wright
Trial Attorney
Money Laundering and Asset Recovery Section
Criminal Division, U.S. Department of Justice

## DEFENDANT'S STIPULATION AND SIGNATURE

After consulting with my attorney and pursuant to the plea agreement entered into this day between the Defendant and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proven the same beyond a reasonable doubt.

Date: September 19, 2017

Raymond Juiwen Ho
Defendant

## DEFENSE COUNSEL'S SIGNATURE

I am counsel for Defendant Raymond Juiwen Ho. I have carefully reviewed the above Statement of Facts with the Defendant. To my knowledge, the Defendant's decision to stipulate to these facts is informed and voluntary.

Date: September 19, 2017

Timothy D. Belevetz, Esq.
Counsel for the Defendant